FILED

06/26/2025

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 8, 2025

**STATE OF TENNESSEE v. VERDELL L. WILLIAMS, JR.**

**Appeal from the Criminal Court for Davidson County**
**No. 2017-B-1124     Mark J. Fishburn, Judge**

_____

**No. M2024-00330-CCA-R3-CD**

_____

The Defendant, Verdell L. Williams, Jr., was convicted in a Davidson County Criminal Court bench trial of four counts of aggravated robbery, one count of aggravated assault, and one count of attempted aggravated robbery.  The sole issue he raises on appeal is whether the evidence was sufficient to establish his identity as one of the perpetrators of the crimes.  Based on our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and JILL BARTEE AYERS, JJ., joined.

Nathan Cate, Nashville, Tennessee (on appeal), and Sean McKinney, Nashville, Tennessee (at trial), for the appellant, Verdell L. Williams, Jr.

Jonathan Skrmetti, Attorney General and Reporter; Caroline Weldon, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Brian Ewald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

At approximately 8:14 p.m. on June 26, 2015, three masked African American men dressed in black rushed into the H.G. Hill store in Goodlettsville shouting commands at the cashier, Maya Shell, to "get down" and then to get back up to open the cash register, and at customer Holli Corn to get on the floor.  At least one of the men was armed with a

handgun, which he held to Ms. Shell's back as she opened the cash register. When Ms. Corn peeked around the corner to see if the men had gone, the gunman pointed his gun directly at Ms. Corn's face. After taking money from the cash register and Ms. Shell's purse, the men departed in a white Mazda 6, the driver of which was waiting for them outside the store.

Approximately forty-five minutes later, the same group of men rushed into the Piggly Wiggly store on Goodlettsville Road. All three were armed with handguns. One of them pointed his gun at the cashier as he ordered her to open the office door and to take the money out of her register. The store's assistant manager, Stephanie Davenport, who was in the locked office counting cash in preparation for closing, saw what was happening through the office's two-way mirror and opened the door for fear that the men would hurt the cashier if they could not get inside. One of the gunmen rushed into the office and ordered Ms. Davenport at gunpoint to open the store's safes. As the gunman was removing the cash from the safes, he ordered Ms. Davenport to hold the door open. A second gunman then ordered her to get down on the floor.

When the men first rushed in, customer Amber Brewer Richardson was in the checkout line with a $20 bill in her hand ready to pay the cashier. The men ordered her and a second customer, Shana Smith, onto the floor. As Ms. Richardson lay on the floor, one of the men removed the $20 bill from her hand. The men also took Ms. Richardson's purse, which she had left at the cash register. One of the men knelt with his knee on Ms. Smith's back as he rummaged through her purse, but nothing was taken from Ms. Smith. The men then fled in the same getaway vehicle.

Metropolitan Nashville Police Department ("MNPD") officers spotted the vehicle as it was fleeing the Piggly Wiggly, followed, lost sight of it, and then doubled back to find it abandoned in the parking lot of an apartment complex. The vehicle was registered to the Defendant's wife, Netay Williams. The Defendant's cell phone was inside the vehicle, along with gloves, a mask, Ms. Richardson's purse, and a sales receipt for a bottle of water that Ms. Shell had bought earlier that day. At the urgent request of several of the Defendant's family members, Ms. Williams, who was in Florida at the time of the crimes, attempted to report her vehicle stolen that night, and then to have the Defendant's cousin, Jacquita Daughetery, report the vehicle stolen. Ms. Williams was ultimately successful in reporting the vehicle stolen after she returned to Nashville to meet in person with a police officer.

Several months later, Alonzo King was arrested and gave a statement identifying himself, the Defendant, Marquis Neal, and Jontarius Sanders as participants in the crimes. Ms. Williams and the Defendant were both arrested a few days later, and Ms. Williams

gave a statement in which she admitted that she fabricated the account of her vehicle's theft.

The Davidson County Grand Jury returned an eight-count indictment in which the Defendant was charged with Codefendants Alonzo Deondre King, Marquis Dewayne Neal, and Jontarius Ladon Sanders in counts one through six with four counts of aggravated robbery, one count of aggravated assault, and one count of attempted aggravated robbery. Codefendant Neal was charged in count seven with evading arrest, and Ms. Williams was charged in count eight with filing a false police report. The Defendant's case was severed from his codefendants' cases, and he proceeded to a bench trial before the Davidson County Criminal Court from July 19-August 2, 2019.

**State's Proof**

The State presented twenty witnesses in its case-in-chief. Because the Defendant does not dispute that the offenses occurred, we summarize only the evidence relevant to the Defendant's identity.

None of the victims were able to identify the Defendant. Ms. Corn described the perpetrators as African American men dressed in black clothing with scarves covering their faces and wearing gloves. She said that one of the men had dreadlocks. Ms. Shell described the perpetrators as African American men dressed in black and wearing long-sleeved shirts, masks over their faces, gloves, and something covering their heads. She added that the man who held a gun to her back had tattoos covering his wrist and was six feet or taller and that he and a second man had facial hair. Ms. Davenport described the perpetrators as African American men wearing all black with latex gloves and masks covering their faces. She did not see any tattoos. Ms. Smith, who said she was a handgun specialist, testified that all three men were armed with Smith & Wesson Sigmas. She stated that the man who knelt on her back was African American with dreadlocks or braids and was wearing a mask but no gloves. Ms. Richardson was not asked to describe the perpetrators.

Detective Leslie Carlisle of the Goodlettsville Police Department, assigned to investigate the H.G. Hill robbery, testified that he was still on the scene when he "was made aware of a second robbery that occurred in Old Hickory at the Piggly Wiggly approximately forty-five minutes after [the H.G. Hill robbery] occurred." As he listened to the radio traffic, he first learned that MNPD officers were in pursuit of the suspect vehicle, and then that the vehicle had been found abandoned at the Charter Village Apartments. Detective Carlisle and MNPD Detective William Mathis were present for the search of the vehicle, which was registered to Ms. Williams. Both also participated in a June 29, 2015 interview with Ms. Williams and the Defendant at their home. Detective

Carlisle testified that Ms. Williams and the Defendant were cooperative during that interview and that neither one was arrested that day.

On cross-examination, Detective Carlisle acknowledged that items were found in the vehicle that did not belong to either Ms. Williams or the Defendant.

Peter Tremblay, who was in his van in the parking lot of the Piggly Wiggly and saw two of the perpetrators as they fled the store to their waiting getaway vehicle, described them as African American, both approximately six feet tall; and wearing painter's masks.

MNPD Sergeant Stephen Weir testified that he and Sergeant Wheeler responded to the Old Hickory Boulevard bridge knowing it was a possible route the suspect vehicle in the Piggly Wiggly robbery might use. As they watched, they saw the vehicle pass and turn north on Rio Vista. Sergeant Weir activated his blue lights and attempted to follow, but the driver of the vehicle turned off the vehicle's lights and sped over a hill out of sight. Realizing that the driver must have turned into the Charter Village Apartments, Sergeant Weir turned around, drove into the apartment complex, and located the vehicle.

MNPD Officer Faye Denson testified that on June 28, 2015, she was dispatched to the Creekwood Apartments to take the report of Netay Williams's stolen Mazda. She said that Ms. Williams told her that she had been out of town, that she had left the vehicle with a cousin, Jacquita Daughetery, and that the vehicle had been in Ms. Daughetery's possession at the time it was stolen.

MNPD Detective William Mathis, assigned to investigate the Piggly Wiggly robbery, testified that the suspect vehicle did not have a license plate affixed when it was recorded on the store's surveillance cameras. Items recovered from the vehicle included the license plate for the vehicle and a cordless screwdriver found together on the driver's side floorboard; a pair of used latex gloves in the back seat; a black nylon ski mask beside the gloves; Ms. Brewer's purse; two cell phone chargers plugged into the center console; a Kyocera cell phone, later identified as Codefendant King's, in the front passenger seat; a Motorola cell phone in the center console; a woman's lined purse commonly used in shoplifting, known as a "boost bag[,]" in the vehicle's trunk; an H.G. Hill sales receipt for Ms. Shell's purchase of the bottle of water; an article of mail addressed to Codefendant Marquis Neal in the trunk; and Ms. Williams's driver's license. He said they attempted to lift fingerprints from the gloves, but no useable prints were found. However, DNA was found on the mask that matched the DNA profile of Codefendant Jontarius Sanders.

During the June 29, 2015 interview of the Defendant and Ms. Williams at their home, the Defendant identified the Motorola cell phone found in the vehicle as his and provided the detectives with the phone's number. The Defendant told Detective Mathis

- 4 -

that the vehicle had been at Ms. Daughetery's residence the week of June 21-June 28, and that he had not driven it during that time. Detective Mathis said he asked the Defendant if there was any activity on his cell phone during the week he had not had access to the vehicle. He could not remember if the Defendant "ever gave [him] a committed answer one way or the other." He agreed that he subsequently learned that there had been activity on the Defendant's cell phone that week that the Defendant was unable to explain.

Detective Mathis testified that on October 15, 2015, Codefendant Alonzo King was arrested for outstanding domestic violence warrants and interviewed at the Madison Police Precinct, where he "gave [them] a full account of these robberies and his involvement in them." Codefendant King named as his accomplices: the Defendant, by the Defendant's name; Codefendant Marquis Neal, by his nickname, "Man"; and Codefendant Jontarius Sanders, by his "street name," "John P." Detective Mathis testified that the Defendant and Ms. Williams were arrested on October 21, 2015. Both gave recorded statements at the time of their arrests. That same day, officers executed a search warrant at their residence, where several different cell phones were found, including a Samsung Galaxy S4 that belonged to Ms. Williams.

On cross-examination, Detective Mathis recalled that in their initial interview, the Defendant and Ms. Williams told him that they regularly allowed Codefendant Neal to borrow Ms. Williams's vehicle. Detective Mathis testified that Ms. Williams acknowledged that the "boost bag" in the vehicle was hers. Ms. Williams also acknowledged that she had been charged in the past with theft. Detective Mathis said the Defendant told him that the Defendant had left his cell phone in the vehicle and forgotten about it. He agreed that he later learned that the Defendant had more than one cell phone. Detective Mathis stated that three cell phones were found in the master bedroom of the couple's home - - Ms. Williams's Samsung cell phone and two others. He said that a fourth cell phone was found in a child's bedroom. The cell phone found in the child's bedroom was inactive, and Detective Mathis's memory was that the other two cell phones found in the master bedroom had not been used around the time of the robberies. He could not recall if he ever received information to indicate the ownership of those cell phones.

Detective Mathis's memory was that Ms. Williams eventually admitted in her later interview that she had left her vehicle at her home when she went to Florida. His understanding was that she initially attempted to report her vehicle stolen over the phone while she was in Florida. He stated that the police department would only take a stolen vehicle report in person from the documented owner of the vehicle, and that it was not until Ms. Williams returned from Florida on June 28 that she was able to meet with an officer in person. On redirect examination, he testified that Ms. Williams's Samsung cell phone was the only phone collected from the Defendant and Ms. Williams's home that had relevant information.

Detective Chad Gish of the MNPD Surveillance and Investigative Support Unit ("SISU"), an expert in digital forensics, performed the extractions of the Defendant's and Ms. Williams's cell phones. Because he was unavailable at the time of trial, his deposition testimony was read into the record. The extraction reports reflected that Ms. Williams's cell phone included a deleted contact listed as "Big Verdell[,]" later identified by Ms. Williams as the Defendant's father; a contact listed as "Brother-in-Law[,]" later identified as the Defendant's brother; a deleted contact for "Hubby Mom[,]" later identified as the Defendant's mother; a contact for "Man[,]" later identified as Codefendant Neal; a contact for "My King[,]" later identified as the Defendant; and a contact for "Quita[,]" later identified as Ms. Daughetery.

The call log report reflected a flurry of incoming and outgoing calls made to and from Ms. Williams's cell phone during the period immediately before and after the robberies, including the following on June 26, 2015: an incoming seven minute, nineteen second call from My King at 4:03 p.m.; a three second outgoing call to My King at 9:43 p.m., a one minute and five second outgoing call to Hubby Mom at 9:44 p.m.; a two second outgoing call to Brother-in-Law at 9:45 p.m.; a two second outgoing call to My King at 9:46 p.m.; a three second outgoing call to Brother-in-Law at 9:47 p.m.; a twenty-three second incoming call from Hubby Mom at 9:49 p.m.; a fifty-nine second call to a number with no contact listed at 9:50 p.m.; an eight second incoming call from Brother-in-Law at 10:02 p.m.; a four minute, one second outgoing call to Quita at 10:02 p.m.; a call to "Sharp Katrina" at 10:06 p.m. with no time duration listed; a fourteen second call to Quita at 10:06 p.m.; and an outgoing one minute, thirty-eight second call to the police department's non-emergency number at 10:07 p.m.

Further incoming and outgoing calls made on June 26, 2015, after Ms. Williams's call to the non-emergency police department number, included the following: a three second outgoing call to Quita at 10:09 p.m.; a seventeen second outgoing call to "Sharp Katrina" at 10:10 p.m.; a one minute, nineteen second incoming call from Quita at 10:10 p.m.; a thirty-two second outgoing call to "Sharp Katrina" at 10:12 p.m.; an incoming one minute call from Man at 10:13 p.m.; a missed call from Quita at 10:24 p.m.; an outgoing thirty-two second call to Quita at 10:25 p.m.; a fifty-five second incoming call from Brother-in-Law at 10:53 p.m.; an incoming forty-five second call from Quita at 11:19 p.m.; an incoming one minute and thirteen second call from Quita at 11:21 p.m.; an incoming fifty-one second call from Quita at 11:31 p.m.; a missed call from Man at 11:57 p.m.; a missed call from Man at 11:58 p.m.; and a four minute, twenty-four second outgoing call to Man at 11:59 p.m.

The call log reflected that the incoming and outgoing calls to Man and others continued into the early morning hours of June 27, 2015. On June 28, 2015, there was

another phone call to the non-emergency number of the police department that lasted for one minute and forty-nine seconds.

The cell phone's text message report reflected incoming and outgoing text messages to and from the same individuals reflected in the call log report, including the following on June 26, 2015: two incoming text messages from My King sent at 8:39 p.m. asking Ms. Williams to call him; a text message from Hubby Mom at 9:43 p.m. that read, "call Pam [the Defendant's mother] AS[A]P now"; a text message from Brother-in-Law at 9:44 p.m., that read, "call and report your car stolen"; an outgoing text message to Brother-in-Law at 9:46 p.m., that read, "call me"; and an outgoing text message to Quita at 11:31 p.m. with a phone number.

Incoming and outgoing text messages on June 27, 2015, included the following: an outgoing text message to Man at 1:23 a.m. that read, "tell dude to call me"; another outgoing text message to Man at 8:11 a.m. that read, "tell dude to call me"; an incoming text message from Man at 2:36 p.m. that read, "call"; an incoming text message at 2:37 p.m. from a number without a contact listed that read, "call me ASAP"; an incoming text message from the same number at 2:37 p.m. that read, "Veddy [the Defendant] needs you ASAP"; an incoming text message from Man at 2:37 p.m. that read, "call me ASAP"; an incoming text message from Man at 3:44 p.m. that read, "called him, tell him to call me"; an outgoing message to Man at 5:23 p.m. that read, "you like this messing sh**, you always doing something"; and a series of incoming and outgoing messages to Quita in which Quita provided her address and asked what day Ms. Williams had left.

On June 28, 2015, there was a series of incoming and outgoing text messages that included outgoing text messages to a number with no contact listed in which Ms. Williams mentioned being stressed. On June 29, 2015, there were more text messages, including an outgoing text message to "Sharda" at 6:01 p.m. that read, "I'm so mad I can't even cry, never again, this husb[and.]"

Detective Gish testified that the cell phone's web history showed that on June 28, 2015, a News Channel 5 article entitled "Three gunmen sought in Hermitage robbery, public assistance needed" was visited thirty-four times, which indicated "that article just stayed on their web page . . . [a]nd whenever they closed their browser and opened their browser, it was still there and it was just refreshed."

The extraction of the Defendant's Motorola cell phone, which was passcode protected, requiring Detective Gish to use a technique called a "chip off procedure" to extract the data, included the following contacts: "Brother[,]" "Man[,]" "Quita[,]" "Wife[,]" and "Young N****[.]" The call log report showed the following incoming and outgoing calls on June 26, 2015: a twenty-three second outgoing call to Wife at 6:09 p.m.;

a nineteen second outgoing call to Man at 6:11 p.m.; a twenty-three second outgoing call to Wife at 6:22 p.m.; a twenty-three second outgoing call to Man at 6:40 p.m.; a seven second incoming call from Young N**** at 6:42 p.m.; a four second incoming call from Young N**** at 7:06 p.m.; a thirty-seven second outgoing call to Young N**** at 7:15 p.m.; a twenty-one second outgoing call to Young N**** at 7:16 p.m.; a sixteen second incoming call from a number with no contact information listed at 7:28 p.m.; a one minute, twelve second incoming call from Quita at 7:52 p.m.; and a twenty second outgoing call to Brother at 8:28 p.m.

Incoming and outgoing text messages to the Defendant's cell phone on June 26, 2015, included the following: an incoming deleted text message from Young N**** at 5:37 p.m. that read, "It's about that time, n****, and it's raining"; an incoming text message from Man at 6:02 p.m. that read, "you coming"; an outgoing text message to Wife sent at 6:02 p.m., "you need to call me"; and an outgoing text message to Man at 6:02 p.m. that read, "I'm on the way."

Detective Gish identified screenshots saved on the Defendant's cell phone that included photographs of the Defendant in a jogging suit. He also identified the cell phone's website history that showed that on June 25, 2015, between 8:41 p.m. and 9:00 p.m., a Piggly Wiggly website was accessed that showed the store's different locations.

On cross-examination, Detective Gish testified that neither the Samsung nor the Motorola cell phone had owner information listed. Neither cell phone was set up to allow "multiple user accounts[.]" However, there was a passcode enabled on the Defendant's cell phone, which meant that "if somebody had the passcode . . . another person could have used that phone . . . [a]nd there would be no user account to let us know that that was a different person."

Netay Williams testified that she married the Defendant on April 11, 2014. She acknowledged she was a charged codefendant in the case and agreed that the prosecutor had not promised her anything in exchange for her testimony. She said that she, her three children, and several other family members and friends went to Orlando, Florida on June 21, 2015, for what was supposed to be a five-day trip, with their return originally scheduled for June 26. However, they were delayed and did not return to Nashville until Sunday morning, June 28, 2015.

Ms. Williams testified that she rented a vehicle for the trip, leaving her Mazda 6 and its only set of keys at home for the Defendant, who did not have his own vehicle. She stated that it was not unusual for the Defendant to use her vehicle. She also allowed others to use it, including the Defendant's friend, Codefendant Neal, whom she had known for at least twenty years because he had grown up with her brother. She stated that Jacquita

Daughetery was the Defendant's cousin, whom she knew well. She said that Codefendant Neal's nickname was "Man[,]" and that the Defendant was known by the nicknames "Veddy" and "Bin Laden."

Ms. Williams testified that on the evening of June 26, 2015, while she was in Orlando, the Defendant's mother, brother, and cousin, Ms. Daughetery, began to call and text her "telling [her] to report [her] car stolen." She said that she eventually talked to the Defendant's mother about reporting her vehicle stolen, but she did not learn anything in that conversation about the reason for the false report.

Ms. Williams testified that she heard from the Defendant the night of June 26, 2015, when he called her from "some man's phone" and then from Codefendant Neal's phone. The Defendant told her that she needed to report her vehicle stolen. The story she eventually came up with was that she had left her vehicle at Ms. Daughetery's home because she did not trust the Defendant to drive it without a license; and that the vehicle had been stolen from Ms. Daughetery's home. She called the police to report her vehicle stolen while she was still in Florida but was unable to make the report. She then asked Ms. Daughetery to report the vehicle stolen, but Ms. Daughetery was unable to do so because she was not the owner of the vehicle. Ms. Williams testified that she was not able to successfully report her vehicle stolen until after her return to Nashville.

Ms. Williams testified that the Motorola cell phone found in her vehicle was the Defendant's, and that it was his only phone. She said the Defendant was with her when she was interviewed by the police on Monday, June 29, and that he confirmed her story that her vehicle had been stolen from Ms. Daughetery's home. After the police left, she took the Defendant to visit Codefendant Neal and waited in her vehicle while the men talked. The Defendant refused to tell her the reason for the stolen vehicle report, but she began to suspect the Defendant's involvement in a robbery after reading the news article about a robbery in which a Mazda 6 was used. That, combined with the Defendant's visit with Codefendant Neal after their police interview, prompted her to confront the Defendant a few days later. The Defendant told her that he, Codefendant Neal, and two other men that Ms. Williams did not know had committed a robbery in Ms. Williams's vehicle and then abandoned the vehicle in Madison. The Defendant told her that Codefendant Neal had been the driver; and that the Defendant and the two other men had entered the store to commit the robbery. The Defendant mentioned robbing only one store, and he did not name the store.

Ms. Williams testified that when she was arrested on October 21, 2015, she told the police the truth about what had happened. She said she knew Codefendant King, who was her sister's next-door neighbor, by the nickname, "Young N****." She was not personally

- 9 -

acquainted with him, but he had been to her and the Defendant's home prior to her Florida trip.

Ms. Williams identified photographs extracted from the Defendant's Motorola cell phone as pictures of the Defendant dressed in "[a] True Religion jogging suit." She agreed that the zip-up jacket portion of the suit had distinctive drawstrings and testified that it was a jacket the Defendant frequently wore. She then identified the Defendant dressed in the same jogging suit in photographs from store surveillance video recordings of the robberies. She also identified photographs showing, among other things, her vehicle captured on store surveillance video recordings and her vehicle's license plate and the cordless screwdriver found on the floorboard of her vehicle. She testified that she recognized the screwdriver as one that belonged to the Defendant, which he had used when assembling their trampoline.

Ms. Williams testified that the only reason she and the Defendant were still married was because he refused to sign their divorce paperwork. She said she had talked to him a few months earlier to ask him about their divorce. During that conversation, the Defendant told her that Codefendant Neal was not going to testify against him because "he already got his time." The Defendant wanted to know if she was going to testify, but she told him she would not discuss it over the phone. Ms. Williams testified that she was telling the truth during her trial testimony.

On cross-examination, Ms. Williams acknowledged that she did not change her statement to the police until after she had been charged with a crime. She also agreed that she had been threatened with the loss of custody of her children. She testified that the True Religion brand jogging suit was "everywhere" and acknowledged that she had a photograph on her Instagram page of her current boyfriend wearing a True Religion hoodie.

On redirect examination, Ms. Williams testified that the statement she gave the police after her arrest was true. She said that an officer told her at the time of her arrest "that they possibly could take [her] kids[,]" but she agreed that she did not fabricate the Defendant's involvement in the crimes due to that comment.

MNPD SISU Detective Joseph Chadwick High, an expert in call detail records, analyzed the Kyocera cell phone found in Ms. Williams's vehicle and reviewed the call detail records from the carriers of cell phones associated with five phone numbers. Detective High testified that because he was unable to analyze the Kyocera cell phone using Cellebrite or similar software that allowed him to connect directly to the phone's computer chip, he "used a software program called ZRT, which is a reporting program that allows us to interface with a camera and take actual images of the display on the phone as we scroll through and look at whatever it is, the contact, call logs, texts." He identified

images he obtained from the cell phone, which included text messages sent and received between the user of the cell phone and "Veddy" between 5:30 p.m. and 5:54 p.m. on June 26, 2015, in which one mentions that it's "about that time" and the other responds that the user of the cell phone was at the house and ready.

Detective High testified that only one of the five phone numbers had a name associated with it that corresponded with a person of interest in the case, which was Codefendant Sanders. The other phone numbers either had no names associated with them or were listed with the name and address of someone in California uninvolved in the case. Detective High testified that that was not unusual for a "pay as you go type device," which he agreed on cross-examination was typically referred to as a "burner phone." He stated that there was no activity between Ms. Williams's cell phone and Codefendant Neal's cell phone until approximately 10:00 p.m. on June 26, 2015.

Codefendant Marquis Neal testified that his nickname was "Man" and that he had known the Defendant for "[s]ome years." He agreed that he and the prosecutor had executed a use immunity agreement, but he refused to answer any questions about the crimes, exercising his Fifth Amendment right not to incriminate himself.

**Defendant's Proof**

Codefendant Jontarius Sanders acknowledged that he had pled guilty "to a case involving a robbery at H.G. Hill and a robbery at Piggly Wiggly on June the 26th of 2015[.]" He said he recalled that date and had no memory of associating in any way with the Defendant.

On cross-examination, he testified that he did not know the Defendant, Codefendant Neal, or Codefendant King. He denied that he stipulated to the statement of facts read into the record at his guilty plea hearing, stating that he "would never be a rat." He had no memory of the prosecutor's having recited that he was accompanied in the robberies by the Defendant, Codefendant King, and Codefendant Neal. When asked why he was listed as a contact in Codefendant King's cell phone if he was unacquainted with Codefendant King, he suggested that someone must have gotten his contact information off the internet. When asked by the trial court if he was saying that he committed the robberies alone, he responded "Yeah. That's how I'm saying it." When then asked by the trial court if he could explain why Codefendant King's cell phone was in the vehicle he used to commit the robberies, he said he did not know and that he "ple[]d the Fifth."

The Defendant's brother, Verlenteez Williams, testified that he was at his mother's house in East Nashville on June 26, 2015, when he received a text message from the Defendant's friend, Codefendant Neal, stating that Codefendant Neal was on his way to

see him. When Codefendant Neal arrived, Codefendant Neal asked him to call the Defendant. Mr. Williams testified that he called the Defendant on the Defendant's cell phone, using the phone number saved in Mr. Williams's cell phone. He recited that number, which was a different number from the number associated with the Defendant's Motorola cell phone. He said he had two phone numbers for the Defendant and recited a second number, which was also different from the number associated with the Motorola cell phone. He stated that he kept the second number stored on his cell phone only because he had at one point "got [the Defendant] a cell phone" and that was the number "associated with [his] bill."

Mr. Williams testified that, based on his conversation with Codefendant Neal, he told the Defendant in his phone call that something had happened to Ms. Williams's car. His understanding was that the Defendant was with their cousin, Ms. Daughetery, at the time he called him. Mr. Williams said he was in his front yard at approximately 9:00 that evening when he saw Ms. Daughetery pull up and Codefendant Neal hand her some car keys.

On cross-examination, Mr. Williams testified that he did not recognize the phone number associated with the Defendant's Motorola cell phone. He acknowledged, however, that if the Defendant had obtained a new phone number, Mr. Williams probably would not have kept the old number stored on his cell phone. He said it would not surprise him to learn that the number associated with the Motorola cell phone was communicating with his cell phone on June 26, 2015. He acknowledged that he was not with the Defendant on the night of June 26, 2015, and did not know where the Defendant was that night.

On redirect examination, Mr. Williams testified that the Defendant had "been balding for quite some time now" and did not have dreadlocks on June 26, 2015.

The Defendant testified that he was released from custody on February 10, 2015, after serving a sentence for aggravated robbery. Ms. Williams, whom he met and married while he was incarcerated, picked him up upon his release and took him to her home. The Defendant said he obtained a job at a company called "Lifting Gear." Ms. Williams also worked, and while he and Ms. Williams were at their respective jobs, they regularly allowed their friend, Codefendant Neal, to borrow Ms. Williams's vehicle.

The Defendant testified that he did what he wanted to do, which included having a girlfriend. He said that Ms. Williams knew about his girlfriend. He stated that the girlfriend had a 2014 silver and black Altima that he drove during the week that Ms. Williams was in Florida. During that week, Codefendant Neal was using Ms. Williams's vehicle. The Defendant and Codefendant Neal were friends, but the Defendant did not hang out with Codefendant Neal because the Defendant was too busy with his job, his

children and stepchildren, and his extramarital affairs. The Defendant stated that he always had two cell phones: one for contact with his girlfriends, and the other for contact with Ms. Williams and other family members.

The Defendant testified that on the afternoon of June 26, 2015, Codefendant Neal called and sent text messages wanting to borrow Ms. Williams's vehicle, and the Defendant told Codefendant Neal that the Defendant needed to ask Ms. Williams. Ms. Williams approved it, and the Defendant was assembling the children's trampoline with his cordless screwdriver, with his cell phone charging inside Ms. Williams's vehicle, when Codefendant Neal arrived to pick up the vehicle. After Codefendant Neal departed, the Defendant realized that he had left his cell phone charging inside the vehicle. He called Codefendant Neal on his other cell phone to tell him that he needed his phone back, but Codefendant Neal stated that he was running late.

The Defendant's recollection of the rest of that day was that he finished assembling the trampoline, went to visit a friend, "Packy[,]" at the Knollcrest Apartments, and then "went to a female's house and did the do." He next called Ms. Daughetery, who asked that he accompany her. She picked him up at his home, and they stopped at her home. During that time, Ms. Williams called Ms. Daughetery asking if Ms. Daughetery had seen him, and he talked to Ms. Williams on Ms. Daughetery's cell phone. Ms. Williams asked him what was going on with her vehicle because everyone was calling her asking her to report it stolen. The Defendant said he told Ms. Wiliams that he did not know; and that Codefendant Neal had the vehicle.

The Defendant testified that, around the same time, his brother called to tell him that Codefendant Neal was at his brother's home. When the Defendant and Ms. Daughetery arrived at the Defendant's brother's home, the Defendant instructed Ms. Daughetery to get out to ask what was happening. She asked Codefendant Neal, who "said it was him and some young n****s." Codefendant Neal gave Ms. Daughetery the vehicle's keys, and the Defendant and Ms. Daughetery were planning to retrieve Ms. Williams's vehicle from the apartment complex where it had been left until they learned from one of Codefendant Neal's friends, who lived in that complex, that a tow truck was towing the vehicle.

The Defendant testified that when Ms. Williams returned to Nashville, he met her in a truck that he had rented. He said he was present during her interview with the police. He stated that he explained to the officers why Codefendant Neal's mail was in Ms. Williams's vehicle but then quit talking. He said he had served nine and one-half years in the penitentiary and, following his release from custody, "wasn't with the lifestyle no more":

I have kids that I missed growing up. So I can't get them years back. So I go to work. I cheat. I do fun things with the kids. I'm a good husband to [Ms. Williams]. She don't know what I do until she finds out, and then that's when we get to arguing and I want to leave, and - -

The Defendant testified that he had tattoos all over his body. Had he been wearing a mask and hood and put a gun to someone's face, they would have seen the pit bull tattoo on his neck. The Defendant also said that he was an experienced robber with a methodology different from that used in the instant crimes, testifying, "I don't touch no civilians. I go straight for the safe." He explained that robbing an individual could potentially result in a kidnapping charge. He considered himself a professional, whereas the perpetrators in the instant case "didn't know what they was doing." He stated that he would never leave his cell phone behind or use his wife's vehicle to commit a robbery. Instead, he would use a stolen vehicle and set it on fire afterwards to destroy any evidence.

On cross-examination, the Defendant acknowledged he had a 2006 aggravated robbery conviction and a 2003 felony theft conviction. He denied that he used his cell phone after he left it in Ms. Williams's vehicle, testifying that it was not passcode protected, and that anyone in the vehicle could have used it. He did not recall receiving or deleting the 5:57 p.m. June 26, 2015 text message from "Young N****" or receiving text messages from Codefendant King asking what time Codefendant King needed to be ready, stating that it was about that time, and stating that Codefendant King was at his house ready. The Defendant testified that he picked up Codefendant Neal to bring him to his home for Codefendant Neal to borrow Ms. Williams's vehicle; but he did not pick up Codefendant King. The Defendant stated that Codefendant Neal used Ms. Williams's vehicle on June 22, June 23, and June 24, but that he parked it each night at the Defendant and Ms. Williams's home.

The trial court questioned the Defendant about the inconsistencies in his testimony, including why Codefendant Neal had to call to get permission to use Ms. Williams's car on June 26 if he used the vehicle every day, whether the Defendant was still assembling the trampoline when Codefendant Neal left in the vehicle and, if so, why the cordless screwdriver was on the floorboard of the vehicle, and why the Defendant had to rent a truck if he had the use of his girlfriend's car. The Defendant testified that Codefendant Neal had to ask to use the vehicle because it was Ms. Williams's vehicle and Codefendant Neal "was in rotation with [Ms. Williams]." The Defendant stated that when Codefendant Neal asked to use the vehicle, he left his home, picked up Codefendant Neal, and brought Codefendant Neal to his and Ms. Williams's home. The Defendant indicated that he left the cordless screwdriver on the floorboard of the vehicle because he no longer needed it, testifying that he had reached the point in the trampoline assembly where all that was left was placement of the safety net. He stated that he rented a truck before Ms. Williams's return home so

that Ms. Williams would not know he was "still messing with [the girlfriend]." When asked about his inconsistency on that topic and why Ms. Williams would be angry if she knew about his girlfriends, he testified that he did not care about his marriage; but that Ms. Williams did.

At the conclusion of the proof, the trial court found the Defendant guilty of all counts charged in the indictment, finding that the State established beyond a reasonable doubt that the Defendant "was one of the four individuals involved in this case."

## ANALYSIS

On appeal, the Defendant contends that the State failed to establish his identity as one of the perpetrators. When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

In support of his contention that the evidence was insufficient to establish his identity as a participant in the crimes, the Defendant cites the lack of eyewitness

identification, Ms. Williams's motivation to lie and her acknowledgement that she allowed Codefendant Neal to use her vehicle, Codefendant Sanders's[1] testimony that the Defendant was not involved in the robberies, and the Defendant's own "uncontradicted" testimony that he was not a participant in the crimes. The Defendant asserts that none of the cell phone evidence "implicates [him] as an active participant in the [r]obberies in any way."

"The identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006), *abrogated on other grounds by State v. Miller*, 638 S.W.3d 136 (Tenn. 2021). The question of identity is a question of fact left to the trier of fact to resolve. *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982). Identity may be established by circumstantial evidence alone. *Rice*, 184 S.W.3d at 662 (citation omitted). "The jury decides the weight to be given to circumstantial evidence, and the inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *Id.* (internal quotations and citation omitted).

Although the victims were unable to identify the Defendant, evidence in support of the trial court's finding that the Defendant was one of the perpetrators included the cell phone calls and incriminating text messages between the Defendant and his codefendants, Codefendant King's statement to police identifying the Defendant as one of the four participants, the use of Ms. Williams's vehicle in the crimes, the calls and texts to Ms. Williams immediately after the crimes instructing her to report her vehicle stolen, the Defendant's cell phone and cordless screwdriver left behind in the vehicle, and Ms. Williams's testimony that the Defendant told her that he had used her vehicle to commit a robbery.

As the trier of fact, credibility determinations were within the province of the trial court. In reaching its guilty verdicts, the trial court, among other things, found Ms. Williams's testimony "quite credible" and "too many coincidences" in the Defendant's explanations of the text messages between himself and Codefendant Neal. The trial court noted the inconsistencies in the Defendant's testimony, as well as the Defendant's failure to call as potential alibi witnesses the friend and girlfriend that the Defendant said he was visiting at the time of the robberies.

We agree with the State that the evidence, when viewed in the light most favorable to the State, was sufficient to establish the Defendant's identity as one of the perpetrators of the crimes. We, therefore, affirm the Defendant's convictions.

---

[1] In his brief, the Defendant refers to the testimony of Codefendant Neal that the Defendant was not involved in the robberies. We believe this was a typographical error, as it was Codefendant Sanders who testified that the Defendant was not involved in the crimes.

## CONCLUSION

Based on our review, we affirm the judgments of the trial court.

_

s/ JOHN W. CAMPBELL
JOHN W. CAMPBELL, SR., JUDGE